UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LENA HILL,

                                  Plaintiff,

          -v-

CAROLE RAYBOY-BRAUESTEIN, DR. DAVID
HART, CAROLE NELSON, PARMANAND
PERSAUD, MARGARET REFEN, BELLEVUE
HOSPITAL & HEALTH CORPORATION, CITY OF
NEW YORK HEALTH & HOSPITAL
CORPORATION,

                                  Defendants.

Case No. 02-CV-3770 (KMK)

OPINION AND ORDER

Appearances:

Marshall Benjamin Bellovin, Esq.
Ballon, Stoll, Bader & Nadler, P.C.
New York, NY
*Counsel for Plaintiff*

David Scott Levine, Esq.
Jonathan Michael Bardavid, Esq.
Kevin R. Danztler, Esq.
New York City Law Department
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

          Plaintiff Lena Hill filed this action alleging discrimination by various defendants,

including her employer, Bellevue Hospital & Health Corporation, as well as the City of New

York Health & Hospital Corporation, and her co-workers and supervisors Carol Rayboy-

Brauestein ("Raboy-Braunstein"),[1] Dr. David Hart, Carole Nelson, Parmanand Persaud, and

_____

[1]Defendant Rayboy-Brauestein's name is misspelled in the Complaint, and was therefore
misspelled on the docket and in the caption for this action.  It appears the Defendants own

Margaret Refen.  Plaintiff brings several causes of action, including:  (1) purposeful racial discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; (2) racial discrimination, in violation of 42 U.S.C. § 1981; (3) retaliation against Plaintiff for filing a discrimination claim, in violation of Title VII; (4) emotional distress as a result of discrimination; and (5) breach of contract.[2]  Plaintiff mentions, but does not specifically plead, violations of New York Executive Law sections 296 and 297.[3]  At the conclusion of discovery, Defendants moved for summary judgment on all counts.  For the reasons stated below, the Defendants' motion for summary judgment is granted in part and denied in part.

## I.  Background

### A.  The Parties

Plaintiff, an African-American woman, has been an employee of New York City for more than 19 years.  (Am. Compl. ¶ 11)  On April 17, 2000, Plaintiff was transferred from Gouveneur Hospital to Defendant Bellevue Hospital & Health Corporation ("Bellevue" or

---

counsel also has misspelled her name, using "Carole Rayboy-Braunstein" while memoranda signed by the Defendant use "Carole Raboy-Braunstein."  The Court will use the spelling Defendant Raboy-Braunstein used in her own memoranda.

[2]The Amended Complaint lists six causes of action.  (Am. Compl. ¶¶ 72-95)  The fourth cause of action states that "Defendant's [sic] knowing and intentional failure to provide plaintiff with assignments like other Laboratory Associate [sic] because of her race violated the terms, conditions and privileges of plaintiff's employment and 42 U.S.C. Section 2000e."  It is unclear whether this cause of action lies in contract, thereby overlapping with her last cause of action which specifically alleges breach of contract, or is based on Title VII, thereby overlapping with her first.  Whatever Plaintiff's actual intent, the Court's disposition of Plaintiff's clearly pled Title VII and contract claims is dispositive of this ambiguous cause of action.

[3]In the Introduction, Plaintiff "claims . . . a cause of action pursuant to Executive Law Sections 296 and 297 of the Sate of New York."  (Am. Compl. Introduction)  In the portion of the Amended Complaint that lists causes of action, the only mention of state law is a "breach[] of contractual obligations to Plaintiff."  (Am. Compl. ¶ 94)

"Bellevue Hospital"), as her division at Gouveneur Hospital closed.  (Defs.' Local Rule 56.1 Statement of Undisputed Facts ¶¶ 1, 3 ("Defs.' 56.1"))  A few years prior to her transfer, Plaintiff filed a discrimination action under Title VII against the New York City Health and Hospital Corporation stemming from her employment at Gouveneur Hospital.  *Hill v. N.Y. City Health & Hosp. Corp.*, No. 96 Civ. 9601 (S.D.N.Y. filed Dec. 20, 1996).  That action was settled in April 2000.  Plaintiff began working at Bellevue Hospital on May 13, 2000, and she was assigned to the Pediatric Hematology laboratory in the Pathology Department.[4]  (Defs.' 56.1 ¶ 4; Pl.'s Statement of Disputed Material Facts Pursuant to Local Rule 56.1 ¶ 4 ("Pl.'s 56.1"))  Her current position is Laboratory Associate, and she holds a license to perform laboratory work. (Am. Compl. ¶ 12; Pl.'s Dep. 21)  Although while at Gouveneur Hospital Plaintiff had performed numerous different types of analyses, including urinalysis, at Bellevue she primarily performed phlebotomies.  (Pl.'s Dep. 23)  A phlebotomist draws blood for analysis, but does not analyze blood herself.

Defendant Raboy-Braunstein is Plaintiff's supervisor, and works as the Senior Associate Director of Pathology.  (Defs.' 56.1 ¶¶ 4-5; Decl. of Marshall B. Bellovin in Opp'n to Defs.' Mot. for Summ. J. ("Bellovin Decl.") Ex. B 160, 163 ("Pl.'s Dep."[5]))  Defendant Parmanand

---

[4]There is some confusion in the Parties' papers over the proper names for the different laboratories in the Pathology Department.  What is clear is that there are two laboratories, one that does primarily pediatric work and one that performs more general work.  The Court will refer to the pediatric laboratory as the "Pediatric Hematology" laboratory and the general laboratory as the "General Hematology" laboratory.

[5]Each party has included different portions of Plaintiff's Deposition with their respective motion papers.  Some portions are attached to the Bellovin Declaration as Exhibit B, others are attached to the Defendants' Local Rule 56.1 Statement of Undisputed Facts as Exhibit AA.  The Court will simply refer to any evidence drawn from Plaintiff's Deposition as "Pl.'s Dep."  If evidence comes from a different exhibit attached to the Bellovin Declaration, that will simply be cited to the Bellovin Decl.

Persaud ("Persaud") is Plaintiff's supervisor in the Pediatric Hematology laboratory (Pl.'s Dep. 160, 163), and is the Laboratory Supervisor.  (Am. Compl. ¶ 5)  Defendant Margaret Refen ("Refen") is the supervisor of Plaintiff's section (Bellovin Decl. Ex. C at 41 ("Raboy-Braunstein Dep."[6])), and is also an Associate Laboratory Microbiologist.  (Am. Compl. ¶ 6)  Defendant Carole Nelson ("Nelson") is also an Associate Laboratory Microbiologist, and one of Plaintiff's supervisors.  (Defs.' 56.1 ¶ 10)  Both Defendants Nelson and Refen are African-American. (Pl.'s Dep. 85-86)  Defendant Dr. David Hart ("Hart") is a pediatric hematologist physician (Am. Compl. ¶ 3), who works in Plaintiff's laboratory two days a week and supervises the work there. (*Id.*; Pl.'s Dep. 160, 163)  He is not Plaintiff's direct supervisor.  (Raboy-Braunstein Dep. 41)

B.  Plaintiff's Transfer to Bellevue

Upon her transfer to Bellevue in May 2000, Plaintiff alleges that she was questioned by Raboy-Braunstein and Persaud about the settlement in her previous case against the Health and Hospital Corporation.  (Pl.'s Dep. 51-55)  Additionally, Plaintiff claims that she was almost immediately subjected to discriminatory treatment.  (Am. Compl. ¶ 17)  Plaintiff alleges that she preferred to be assigned to the General Hematology laboratory, but was instead assigned to the Pediatric Hematology laboratory.  (Pl.'s Dep. 134, 138)  Plaintiff claims this assignment is discriminatory because only "minorities" work in the Pediatric Hematology laboratory "during the day."[7]  (*Id.* 134)  Plaintiff further alleges that she was assigned to the Pediatric Hematology

---

[6]Each party has also provided portions of Defendant Raboy-Braunstein's Deposition.  This portions are attached to the Bellovin Declaration as Ex. C and the Defendants' Notice of Motion for Summary Judgment as Ex. B.  The Court will refer to evidence drawn from either of these sources as coming from the "Raboy-Braunstein Deposition."

[7]The Pediatric Hematology laboratory is normally open from 9 A.M. to 5 P.M. each day. (Bellovin Decl. Ex. D 51)

laboratory without the proper training.[8]  (Am. Compl. ¶ 19; Pl.'s Dep. 47)  According to

Plaintiff, she was trained in microscopic urinalysis without the necessary prerequisite training

course, allegedly in contravention of the hospital's regulations.  (Pl.'s Dep. 47-50, 59)

Additionally, Plaintiff alleges that her supervision in the Pediatric Hematology laboratory was

discriminatory.  According to Plaintiff, Dr. Hart, one of her supervisors, closely micro-manages

her work, while he does not do so for "mainstream whites."  (Pl.'s Dep. 142, 146-47)

Approximately one month after beginning work at Bellevue, on June 12, 2000, Plaintiff

was given three proficiency slides by Persaud, another of her supervisors, to test her ability to

identify certain types of cells.  (Pl.'s Dep. 66-67; Defs.' Notice of Mot. for Summ. J. Ex. D

("Defs.' Mot."))  Plaintiff did not identify these slides correctly.  (Defs.' Mot. Ex. D)  Plaintiff

alleges that Persaud, who administered the test, lacked knowledge on the subject and thus

wrongly evaluated Plaintiff's correct assessments.  (Pl.'s Dep. 307)  Plaintiff claims that white

employees were not given such tests before they were trained on the material being tested.  (Am.

Compl. ¶ 24)  Over the next year, Plaintiff was given approximately eight weeks of additional

training in both chemical and microscopic urinalysis.  (Defs.' 56.1 ¶¶ 13, 16; Defs.' Mot. Exs. F,

I, J, K)

Soon after she started at Bellevue, Plaintiff asked for vacation time during the week of

July 4, 2000.  She allegedly was told by Raboy-Braunstein to produce an airline ticket.[9]  (Am.

---

[8]Plaintiff admits that she received some training, but she alleges that training was improper.  (*See* Notice of Mot. for Summ J. Ex. T)

[9]Plaintiff's testimony here is inconsistent with the documentary record.  In her deposition and her Amended Complaint, Plaintiff alleges that Defendant Raboy-Braunstein demanded she produce a ticket.  In her original complaint to the EEOC, discussed *infra*, Plaintiff alleges this demand was made by Defendant Persaud. (Defs.' Mot. Ex. R)

Compl. ¶ 25; Pl.'s Dep. 69-70)  Plaintiff asserts that white co-workers are not asked for airline

tickets when they wish to go on vacation.  (Am. Compl. ¶ 26; Pl.'s Dep. 70)  On June 24, 2000,

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC") alleging that she was racially discriminated against by being forced to show an airline

ticket in order to be granted vacation time.  (Defs.' 56.1 ¶ 7; Defs.' Mot. Ex. R)  On June 30,

2000, the EEOC issued a right to sue letter, as it was unable to determine whether Plaintiff's

civil rights had been violated.  (Defs.' Mot. Ex. R)

On July 30, 2000, Plaintiff was injured by an autistic patient.  (Am. Compl. ¶ 27; Pl.'s

Dep. 71, 73)  She alleges that by August 2000, she was medically cleared to return to work for

all duties except phlebotomy.  (Am. Compl. ¶ 27)  However, Raboy-Braunstein did not allow

Plaintiff to return to work at that point on the grounds that Plaintiff could not perform her on-the-

job duties due to injury.  (Am. Compl. ¶ 27; Pl.'s Dep. 72)  Plaintiff alleges that her treatment

was different from that of white employees because she knew of a white employee who was

allowed to return to work despite having a cast on one arm.  (Am. Compl. ¶ 28; Pl.'s Dep. 73-74)

Plaintiff returned to work in October 2000.  (Pl.'s Dep. 73)

On December 24 and 26, 2000, Defendants allege that Plaintiff refused to perform tasks

requested by supervisors.  (Defs.' 56.1 ¶ 9; Defs.' Mot. Exs. G, H)  Plaintiff alleges that Raboy-

Braunstein directed these supervisors to write Plaintiff up for insubordination on December 26,

2000, despite Plaintiff's inability to perform the procedures due to injury.  (Pl.'s 56.1 ¶ 9)  In

January 2001, Plaintiff received a negative evaluation of her work covering the period from

April 2000 to October 2000.  (Defs.' Mot. Ex. E)  The evaluation noted that Plaintiff

"experience[d] difficulty performing microscopic examination . . . of urine after six weeks of

training."  (*Id.*)  The report also noted that since her injury Plaintiff "has been ill on several

occasions including alternate Sundays that she was scheduled to work."  (*Id.*)

Plaintiff's key to the Pediatric Hematology laboratory was either lost or stolen on January

24, 2001.  (Pl.'s Dep. 75)  When Plaintiff went to report the missing key, allegedly with

Defendant Refen's permission, Refen reported Plaintiff's absence to Raboy-Braunstein.[10]  (Pl.'s

Dep. 75, 80-81)  Plaintiff alleges that this was because of her race.  (Am. Compl. ¶ 32)

On March 26, 2001, Plaintiff was asked to take blood from a child in the hospital.  She

used a venepuncture procedure, when the child allegedly requested a finger-stick procedure.[11]

(Pl.'s Dep. 110)  Soon after, on March 28, 2001, Plaintiff alleges that she was confronted

without warning by Refen, Nelson, and another supervisor who subjected her to a test of her

microscopic testing skills.  (Am. Compl. ¶¶ 35-36; Pl.'s Dep. 88)  Plaintiff alleges this test was

demanded by Raboy-Braunstein in response to the events of March 26th.  (Pl.'s Dep. 91)

Defendants assert that Plaintiff had been informed of the test the day before.  (Defs.' Mot. Ex. N)

Plaintiff refused to take the test, stating that she felt ill and had forgotten to take her medicine

earlier that day.  (Pl.'s Dep. 88-90)  At a disciplinary hearing, Plaintiff was disciplined for these

incidents and given a ten-day suspension without pay.  (Pl.'s Dep. 133-34; Defs.' Mot. Ex. S)

---

[10]Plaintiff alleges in her Amended Complaint that Raboy-Braunstein refused to replace the key
for five months in retaliation for her absence.  (Am. Compl. ¶¶ 30-31)  Plaintiff also alleges she
was written up several times for absences which were due to her lost key and that a co-worker
who lost a computer key received a replacement promptly.  (Pl.'s Dep. 80-81)  No party has
included any part of Plaintiff's deposition testimony that substantiates these allegations.

[11]The child and her parents later signed affirmations, for use in Plaintiff's August 8 "Step 2"
hearing, to the effect that the child did not have a fear of venepuncture.  (Pl.'s Dep. 111, 125)  In
that proceeding, Nelson attempted to assist Plaintiff by obtaining a statement from the patient's
mother in Plaintiff's defense.  (Pl.'s Dep. 111, 126-27)  The Step 2 hearing officer disregarded
the statements because they were signed after the initial disciplinary proceeding.  (Defs.' Mot.
Ex. Y)

Plaintiff appealed the suspension, but it was affirmed after an additional hearing.  (Defs.' Mot. Ex. Y)

Plaintiff then filed additional complaints with the EEOC from July through December 2001, complaining of the alleged discrimination which was the basis of this action, notably, that her testing was discriminatory, that she was improperly trained, that she was subjected to excessive scrutiny, and that her supervisors had failed to replace her laboratory key.  (Defs.' Mot. Ex. T)  The EEOC refused to file a claim on her behalf because she had failed to state an actionable claim.  (*Id.*)  The EEOC mailed a right-to-sue letter to Plaintiff, dated December 31, 2000.  (Defs.' Mot. Ex. U)  On February 20, 2002, Plaintiff contacted the EEOC, claiming she had never received her right-to-sue letter.  (*Id.*)  The EEOC mailed an additional copy of the December 31, 2002 letter to Plaintiff, which she allegedly received on February 23, 2002.  (Pl.'s Dep. 225)

In addition to the allegedly discriminatory treatment outlined above, Plaintiff also alleges she was called racist epithets on more than one occasion.[12]  On an unspecified date shortly after she began working at Bellevue, Plaintiff alleges that she was called a "nigger" by Raboy-Braunstein in an attempt to provoke her into striking a supervisor.  Plaintiff claims Raboy-Braunstein placed her face so close to Plaintiff's that their noses almost touched.  (Pl.'s Dep. 60-61, 99, 196)  Plaintiff also alleges that she was called the same epithet "maybe twice" by Dr. Hart.  (Pl.'s Dep. 169)  There were no witnesses to either of these incidents.  (Pl.'s Dep. 61, 170)  At one point in her deposition testimony, Plaintiff states that she did not report these comments

---

[12]Plaintiff did not include these incidents in the complaints she filed with the EEOC.  (Defs.' Mot. Exs. R, T)

to her supervisors (Pl.'s Dep. 191), but, at another point, she also states that she reported the statements to Defendant Nelson.  (Pl.'s Dep. 170)

### C.  Procedural History

Plaintiff filed her initial Complaint on May 16, 2002.  On May 22, 2002, Plaintiff filed an Order to Show Cause demanding that Defendants transfer her to a different hospital location and restraining the Defendants from imposing any restraints on Plaintiff, harassing her or otherwise disturbing her peace.  This Order to Show Cause was denied by the Honorable Barbara S. Jones on May 24, 2002.  Defendants Raboy-Braunstein, Hart, Nelson, Persaud, Refen, Bellevue Hospital, and the New York City Health & Hospital Corporation all filed a Motion to Dismiss pursuant to Rule 12(b)(6) on August 19, 2002.  Plaintiff then filed an Amended Complaint on February 3, 2003, which Defendants answered on February 27, 2003.  Defendants then withdrew their Motion to Dismiss.  Discovery was conducted, and the case was reassigned to the undersigned on September 28, 2004.  Defendants subsequently filed this Motion for Summary Judgment.  Plaintiff explicitly withdrew some of her claims during the briefing of the Motion for Summary Judgment, specifically, her Title VII claims against the individually named Defendants, and her § 1981 municipal liability claim.[13]

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view

---

[13]Though Plaintiff did not explicitly withdraw her contract cause of action, she failed to respond to Defendants' argument that this cause of action must be dismissed.

all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in his or her favor.  *See Tufariello v. Long Island R.R.*, 458 F.3d 80, 85 (2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006).  "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'"  *Id*. (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotations omitted)).

The materiality of the facts considered by the Court will be governed by substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Castro v. Met. Transp. Auth.*, 04 Civ. 1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be to "isolate and dispose of factually unsupported claims."  *Celotex Corp.*, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgement to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

### B. Plaintiff's Title VII Claims

Plaintiff alleges three different Title VII claims against the institutional Defendants in this case: (1) purposeful racial discrimination; (2) a hostile working environment; and (3) retaliation. Plaintiff dropped her Title VII claims against the individual Defendants ((Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. 1 n.1 ("Pl.'s Opp'n Mem.")), as Title VII does not authorize suits against individuals. *See Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003).[14]

---

[14]Plaintiff's claims against the individual Defendants under the New York State Human Rights Law, which does allow suits against individuals, will be discussed *infra*.

### 1.  Purposeful Racial Discrimination

#### a.  Prima Facie Case of Discrimination

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff may establish a prima facie case of racial discrimination under Title VII by pleading the elements of the test announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The *McDonnell Douglas* test requires that a plaintiff show: "(1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination."  *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999); *see also McDonnell Douglas*, 411 U.S. at 802.  Plaintiff's burden in establishing a prima facie case is "de minimis."  *Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002).  However, a party's bald assertions, without more, are insufficient to overcome a motion for summary judgment.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at *3 (S.D.N.Y. Sept. 28, 2006); *During v. City Univ. of N.Y.*, No. 01 Civ. 9584, 2005 WL 2276875, at *4, *8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

If the plaintiff satisfies this initial burden, the burden of production (but not persuasion) shifts to the employer to articulate a legitimate, non-discriminatory reason for the action. *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). If the employer carries this burden, the burden of production shifts back to the plaintiff to demonstrate that the legitimate reasons offered are pretextual. *Id.* The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate. *Id.*

### b. Plaintiff is a Member of a Protected Class Qualified for Her Position

Plaintiff clearly meets the first *McDonnell Douglas* prong. It is undisputed that Plaintiff is an African-American female whose race places her in a protected class. *See Norville*, 196 F.3d at 95.

As for the second prong, to demonstrate that she was qualified for her position, Plaintiff "need not demonstrate that [her] performance was flawless or superior. Rather, [she] need only demonstrate that [she] possesses the basic skills necessary for the performance of [the] job." *Douglas*, 207 F. Supp. 2d at 289 (internal quotations and citations omitted). Plaintiff is licensed to work in laboratories, has worked in hospitals for nearly 20 years, and worked in laboratories for much of that time. *See Branson v. Ethan Allen, Inc.*, No. 02 CV 6588, 2004 WL 2468610, at * 5 (E.D.N.Y. Nov. 3, 2004) ("[T]he fact that the employer has already hired the employee and retained the employee for a significant period of time support [sic] the inference that the employee was minimally qualified for the job." (internal citations omitted)). Though Defendants have produced evidence that Plaintiff received poor performance evaluations, they have not

alleged that Plaintiff was unqualified for her job.  Plaintiff has clearly produced enough evidence to meet her minimal burden of showing she was qualified to be a laboratory associate.  *See de la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 20-21 (2d Cir. 1996).

<u>c.  Adverse Employment Actions</u>

Regarding the third prong of the *McDonnell Douglas* test, a plaintiff demonstrates an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment.  *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  To be "materially adverse," Plaintiff's working conditions must undergo a change "more disruptive than a mere inconvienience or an alteration in job responsibilities."  *Id.*  Such a change might be a demotion, a reduction of wages, a loss of benefits, a significant loss of material responsibilities, or another action particular to Plaintiff's circumstances.  *See id.*; *Pimentel v. City of New York*, No. 00 Civ. 326, 2002 WL 977535, at *3 (S.D.N.Y. May 14, 2002) ("A material adverse change is one that has an attendant negative result, a deprivation of a position or an opportunity.  While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." (internal quotations and citations omitted)).  Negative reports or evaluations alone are generally not adverse employment actions, but they can be considered adverse employment actions when they give rise to "material adverse changes in work conditions."  *Hawana v. City of New York*, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002).  Lesser actions may also constitute adverse employment actions.  *See Pimentel*, 2002 WL 977535, at *3.  "Because there are no bright line rules as to which employment actions meet the threshold for adverse, courts must make this determination on a case-by-case basis."  *Id.* (internal quotations and citations omitted).

14

Plaintiff asserts that the following are examples of the adverse employment actions taken against her by Defendants:  (1) assignment to the Pediatric Hematology laboratory; (2) insufficient training; (3) requests for documentation before granting vacation; (4) delayed replacement of her laboratory key; (5) excessive scrutiny and review; (6) delay of her post-injury return to work; and (7) suspension for her alleged disciplinary infraction.  On the facts of this case, only the last two of these incidents, the delay in her return to work and her suspension, constitute adverse employment actions.

Plaintiff's assignment to the Pediatric Hematology laboratory is not, on its own, an adverse employment action.[15]  Although Plaintiff argues in her Memorandum of Law that she was told she would be assigned to the General Hematology laboratory at Bellevue (Pl.'s Opp'n Mem. 11), Plaintiff admits in her deposition that she was told prior to her transfer that when she went to Bellevue Hospital her duties would primarily involve phlebotomy, not analysis.  (Pl.'s Dep. 137-38)  She also cites no evidence in the record that she was told she would be assigned to the General Hematology laboratory.  (See Pl.'s Opp'n Mem. 11)  Since her transfer to Bellevue, Plaintiff has not requested any change in position that would allow her to do blood or urine analysis.  (Pl.'s Dep. 287)  Nor does Plaintiff allege that she has been given a different job title or assigned to a position for which she is unqualified; her argument is merely that her skills as a laboratory technician are underutilized because she is not asked to engage in blood analysis. (Pl.'s Dep. 242)

---

[15]Plaintiff does not allege in her Amended Complaint that her assignment was an adverse employment action.  She did allege her placement there was discriminatory in her deposition and in her Memorandum of Law in opposition to the Summary Judgment Motion.  (See Pl.'s Dep. 134, 138; Pl.'s Opp'n Mem. 11)

Moreover, even taking Plaintiff's conclusory allegations as true, a change in job responsibilities is not necessarily an adverse employment action. *See Galabya*, 202 F.3d at 640. Neither is underutilization of a Plaintiff's skills. *See Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 247 (S.D.N.Y. 2001). To be an adverse employment action, these actions must be accompanied by materially adverse changes in employment, such as a demotion or a loss of wages. *See Pimentel*, 2002 WL 977535, at *3. Plaintiff also asserts that there was no possibility for promotion in the Pediatric Hematology laboratory. (Pl.'s Dep. 82) However, Plaintiff's assertion, without proof, is insufficient to survive a motion for summary judgment. *See Hill v. Melvin*, No. 05 Civ. 6645, 2006 WL 1749520, at *5 (S.D.N.Y. June 27, 2006) ("[A party's] bald assertion, unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (internal quotations omitted)).

The second adverse employment action alleged by Plaintiff is that she was insufficiently trained to perform urinalysis.[16] (Pl.'s Opp'n Mem. 7-8) Plaintiff argues that she failed a surprise urinalysis test because she was inadequately trained after arriving at Bellevue. (Pl.'s Dep. 47-50, 67) She also alleges that other employees were not given a similar test. (*Id.* 67-68) Denial of training can constitute an adverse employment action where it "bear[s] on either plaintiff's

---

[16]Plaintiff's allegations regarding insufficient training are somewhat confusing when placed alongside some of her other allegations. For instance, Plaintiff claims it was an adverse employment action to place her in the Pediatric Hematology laboratory because that placement underutilized her analysis skills while simultaneously claiming she was insufficiently trained in one type of analysis, namely urinalysis. She also claims this lack of training led to micro-management of her work. Either Plaintiff's placement in the Pediatric Hematology laboratory involved some use of her analysis skills, thus necessitating training, or her lack of urinalysis training is understandable, as it was not part of her job description. It is unclear why the hospital would require Plaintiff to be trained in urinalysis if its intention was, as Plaintiff alleges, to ignore her valuable analysis skills. The Court, in an attempt to view all facts in the light most favorable to Plaintiff, will ignore these contradictions, as they are not relevant to the outcome of this Motion.

opportunities for professional growth and career advancement or directly on plaintiff's compensation."  *Nakis v. Potter*, No. 01 Civ. 10047, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004).  When an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action.  *See Kravitz v. N.Y. City Transit Auth.*, No. 94 Civ. 5910, 2001 WL 1646513, at *6-7 (E.D.NY. Dec. 18, 2001).

Here, there is little evidence that Plaintiff was denied training or that she suffered any adverse consequences from the allegedly inadequate training.  Plaintiff admits she was not penalized in pay, rank, or responsibility for failing this test.  (Pl.'s Dep. 242-43)  Additionally, Defendants have produced evidence that the purpose of this initial urinalysis test was diagnostic. (Raboy-Braunstein Dep. 47-48, 58; Defs.' Mot. Ex. C)  This evidence is supported by events subsequent to the test.  Defendants have produced an abundance of evidence that Plaintiff received significant amounts of training in both hematology and urinalysis after she failed the test, including:  (1) a memo dated January 3, 2001, from Raboy-Braunstein to Plaintiff documenting that Plaintiff had received six weeks of training in urinalysis and an attached packet of materials that she was to study for two additional weeks, which included sections on urine cell analysis and microscope use, (Defs.' Mot. Ex. I); (2) a receipt, signed by Plaintiff, for the aforementioned packet of training materials, (*id.* Ex. K); (3) a training calendar listing at least two weeks of training in urinalysis, (*id.* Ex. F); and (4) the deposition testimony of Raboy-Braunstein that Plaintiff was to receive whatever training "was necessary."  (Raboy-Braunstein Dep. 58)

Plaintiff does not deny that she received at least six weeks of training (Pl.'s Opp'n Mem. 7); instead, she argues that the training was periodically interrupted and, thus, insufficient.[17]  (*Id.*; Pl.'s Dep. 303)  According to Plaintiff, the adverse employment action was not an intentional denial of training, but a failure to train adequately that led to a negative performance evaluation.[18]  (Pl.'s Opp'n Mem. 8)  It is here that Plaintiff has waded into murkier legal ground. In essence, she argues not that Defendants denied her training opportunities, but either that they failed to train her enough or that they failed to train her properly.  This argument has two problems.  First, she cites no law supporting the proposition that a failure to mandate additional training can support a finding of an adverse employment action.  The only case she cites for the proposition that inadequate training is an adverse employment action, *Nakis v. Potter*, is distinguishable.  In that case, the plaintiff had specifically requested to attend certain types of training courses and was denied.  *Nakis*, 2004 WL 2903718, at *4, *7.  Here, Plaintiff cites no evidence that she was denied any requested training.  In fact, she initially felt she passed the diagnostic test, thereby obviating any need for training, because her supervisor's knowledge of

---

[17]She also counterintuitively asserts that her failure to pass the initial test was not the result of being untrained, but that her superiors' knowledge of the subject was inferior to her own.  (Pl's. Mem. 7)

[18]Plaintiff does not specifically allege that her negative performance evaluation, given after the allegedly insufficient training, was an adverse employment action.  This is for good reason. Negative performance evaluations do not constitute adverse employment actions.  *See Weeks v. N.Y. State Div. of Parole*, 273 F.3d 76, 86 (2d Cir. 2001) ("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."), *abrogated on other grounds by Nat'l R.R. Passengers Corp. v. Morgan*, 536 U.S. 101 (2002); *Carmellino v. Dist. 20 of N.Y. City Dep't of Educ.*, No. 03 Civ. 5942, 2006 WL 2583019, at *3 (S.D.N.Y Sept. 6, 2006) ("[A] negative performance evaluation-without more-does not ordinarily constitute an adverse employment action for purposes of a discrimination claim.").  The negative evaluation in this case did not lead to any change in Plaintiff's employment conditions; she was simply ordered to undergo additional training.  (Defs.' Mot. Ex. E)

cell differentials was inferior to her own and he incorrectly graded her test.  (Pl.'s Dep. 307)  She

has also provided no evidence that the training itself was inadequate, only assertions that she did

not like the trainer, that she felt that she was trained out of order, and that she occasionally had to

do other work in addition to training (Pl.'s Dep. 50-51, 59, 303), but these conclusory statements

are insufficient.  *See Kravitz*, 2001 WL 1646513, at *6.  Second, the best way to measure the

adequacy of Plaintiff's training is to compare it to other hospital employees.  However, Plaintiff

has produced no evidence that other employees' training is not interrupted by other work.

Finally, Plaintiff has not produced any evidence that she was materially harmed by the training.

There is no evidence that she suffered a loss of pay, a change in responsibility, or any other

adverse employment action because of her allegedly inadequate training.  Thus, there is no

evidence to support a finding that Plaintiff was materially affected by her training in a way that

would constitute an "adverse employment action."  *Id.* at *6-7.

Plaintiff next alleges that her supervisor's demand that she produce an airline ticket to

verify her request for vacation was an adverse employment action.[19]  However, inconveniences

do not constitute adverse employment actions.  *See Nakis*, 2004 WL 2903718, at *20 (holding

delay in providing business cards, telephone books and bathroom key, and allegedly excessive

criticism do not constitute adverse employment actions).  To be an "adverse employment

action," the condition must materially change the conditions of employment, not simply require

minor additional effort on the part of Plaintiff.  *See Galabya*, 202 F.3d at 640 (holding

administrative mishaps during employee's transfer are not adverse employment actions).  In

addition, Plaintiff must have experienced "some attendant negative result, [such as] a deprivation

---

[19]Defendant Raboy-Braunstein denies that she participated in this incident.  (Raboy-Braunstein
Dep. 119)

of a position or opportunity." *Pimentel*, 2002 WL 977535, at *3.  Requesting additional

documentation for vacation time fails this test.  *See Nicastro v. Runyon*, 60 F. Supp. 2d 181, 186

(S.D.N.Y. 1999) (holding requiring documentation for sick leave does not constitute adverse

employment action).  Thus, Plaintiff's supervisor's alleged request for travel documentation is

not an adverse employment action.

The same analysis applies to Plaintiff's allegations regarding the laboratory key.  Plaintiff

may feel that she has been treated differently by her supervisors because her key was not

promptly replaced, and she was certainly inconvenienced by having to find other employees to

let her into the laboratory.  (Pl.'s Dep. 75, 80)  However, as a matter of law, the failure to

promptly provide a replacement key did not cause a materially adverse change to Plaintiff's

employment, particularly where the absence of a key did not prevent her from working.  *See*

*Nakis*, 2004 WL 2903718, at *20 ("[T]he delay in providing plaintiff with bathroom keys . . .

do[es] not rise to the level of materially adverse changes in the terms and conditions of

employment."); *Pimentel*, 2002 WL 977535, at *4 ("[W]here there is no loss of salary, benefits,

seniority, tenure or promotion opportunities, there is no adverse employment action.").

Nor can Defendants' alleged micro-management of Plaintiff constitute an adverse

employment action.  Plaintiff claims that she was subjected to excessive scrutiny and review by

her supervisors, Defendants Persaud and Hart.  She alleges that they "singled her out" and "stood

over" her while she performed her work.  (Pl.'s Dep. 197)  She has produced no evidence that

she received scrutiny in excess of other employees other than her own perception that she was

treated differently.[20]  Excessive scrutiny, without more, does not constitute an adverse

---

[20]Plaintiff alleges that Dr. Hart scrutinized her work in the Pediatric Hematology laboratory.
(Pl.'s Dep. 196-97)  She claims this treatment is discriminatory because he does not scrutinize

employment action.  *See Fleming v. Verizon N.Y., Inc.*, No. 03 Civ. 5639, 2006 WL 2709766, at *11 (S.D.N.Y. Sept. 22, 2006) (stating that excessive monitoring and oversight of work do not constitute adverse employment action); *Uddin v. City of New York*, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006) ("Reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place.  However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." (internal quotations and citations omitted)); *Bennett*, 136 F. Supp. 2d at 248 ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); *Nicastro*, 60 F. Supp. 2d at 186 ("[M]any of the actions complained of by plaintiff, such as scrutiny from his supervisors that he deemed excessive . . . do not constitute 'adverse employment actions.'"); *Castro v. N.Y. City Bd. of Educ. Pers.*, No. 96 Civ. 6314, 1998 WL 108004, at *7 (S.D.N.Y. Mar. 12, 1998) ("[A]lthough reprimands and close monitoring may cause an employee embarrassment or anxiety, such intangible consequences are not materially adverse alterations of employment conditions.").

Plaintiff's next allegation of an adverse employment action is that she was delayed in returning to work after her July 30, 2000 injury because her supervisor refused to allow her to return until she was cleared to perform all her duties.  She argues that this materially affected her

---

white employees in a similar manner.  (Am. Compl. ¶ 63)  However, Plaintiff has also alleged that no white employees work in the Pediatric Hematology laboratory.  (Pl.'s Dep. 134)

employment conditions because her workers' compensation benefits were less than her salary.[21]

(Pl.'s Opp'n Mem. 10)  A decrease in salary constitutes an adverse employment action.  *See*

*Galabya*, 202 F.3d at 640.  This is true even when the reduction may be temporary.  *See*

*Carcione v. Brooklyn Navy Yard Dev. Corp.*, No. 01 Civ. 0953, 2006 WL 1313821, at *6

(E.D.N.Y. May 12, 2006) (holding that revocation of temporary promotion constituted adverse

employment action).  Here, as alleged, Plaintiff received less compensation between the time she

wished to return to work, August 2000, and the time she did in fact return to work, October of

that same year.  A two month reduction in salary materially affects an individual's employment,

and thus constitutes an adverse employment action.  *See Galabya*, 202 F.3d at 640.

Finally, as Defendants do not dispute, Plaintiff's ten-day suspension is an adverse

employment action, as it is a material alteration of Plaintiff's working conditions.  *See Forts v.*

*N.Y. City Dep't of Corr.*, No. 00 Civ. 1716, 2003 WL 21279439, at *8 (S.D.N.Y. June 4, 2003)

("Plaintiff suffered adverse employment action by reason of the suspension.").[22]

### d.  Inferences of Racial Discrimination

To meet the fourth prong of the *McDonnell Douglas* test, Plaintiff must show that any

adverse employment actions were the result of racial discrimination.  *See Gorham v. Transit*

---

[21]Plaintiff submitted no evidence regarding her salary at the time of injury and provided no evidence regarding the maximum workers' compensation benefits she could have or actually did receive.  As Defendants do not contest this point, however, the Court accepts that Plaintiff received less compensation under workers' compensation than she would have at work.

[22]Plaintiff repeatedly stated in her Memorandum of Law that the cumulative effect of each allegedly adverse action that, as explained above, are not actionable in isolation, amounts to an adverse employment action.  Although, as discussed *infra*, Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim.

*Workers Union*, No. 98 Civ. 313, 1999 WL 163567, at *4 (S.D.N.Y. Mar. 24, 1999).  "Hostility

or unfairness in the workplace that is not the result of discrimination against a protected

characteristic is simply not actionable."  *Nakis*, 2004 WL 2903718, at *20 (citing *Brennan v.*

*Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).  To establish her prima facie case, and

thereby shift the burden of production to the Defendants, Plaintiff must merely establish an

inference of discrimination.  *See Norville*, 196 F.3d at 95.  Though not required, this is most

commonly done by demonstrating that other similarly situated persons, not of Plaintiff's

protected class (in this case, of Plaintiff's race), were treated more favorably than her in the

workplace.  *See Abdu-Brisson*, 239 F.3d at 467-68.  Plaintiff relies on this method here; the

Amended Complaint states numerous times that the Defendants treated white employees

differently from Plaintiff.[23]  (Am. Compl. ¶¶ 22, 24, 28, 33, 37, 39, 50, 64, 74)  To be similarly

situated, these persons must have been subject to the same standards governing performance

evaluation and discipline and must have engaged in conduct similar to Plaintiff's.  *Id.* at 96; *see*

*also Mazzella v. RCA Global Comm'ns Inc.*, 642 F. Supp 1531, 1547 (S.D.N.Y. 1986) (stating

that the similarly situated employees must have the same supervisor).  Thus, to establish her

prima facie case based on disparate treatment, Plaintiff must bring forth some evidence that other

similarly situated employees who do not belong to her protected class were allowed to return to

---

[23]This is not the only way to raise an inference of discrimination.  *See Abdu-Brisson*, 239 F.3d at
467-68.  Plaintiffs may also raise such an inference through direct or circumstantial evidence.
*Id.* (holding that evidence of employer's intent focus on age of pilot workforce and numerous
comments about older pilots by supervisor sufficient to establish plaintiffs' prima facie burden).
Here, Plaintiff did not argue any other basis for raising the necessary inference of discrimination
in her Memorandum of Law, nor did she allege any other basis for her belief that she was
discriminated against in her Amended Complaint.  Here, there are allegations of discriminatory
language similar to that in *Abdu-Brisson*.  As discussed *infra*, Plaintiff's conclusory allegations
of discriminatory language are insufficient in this case to raise an inference of discrimination.

work prior to being able to fully perform their duties, and that other employees who do not

belong to her protected class were not given suspensions for insubordination.

Plaintiff has failed on both counts.  Although the burden of meeting the prima facie case

is "de minimis," Plaintiff must adduce some admissible evidence that would support her claims.

*See Douglas*, 207 F. Supp. 2d at 289.  Plaintiff claims that a white employee was allowed to

return to work with her arm in a cast, even though Plaintiff was denied the opportunity to return

to work until she was able to fully perform her duties.  (Pl.'s Opp'n Mem. 9-10)  To show that

this alleged difference in treatment raises an inference of discrimination, Plaintiff must show that

this employee was similarly situated to Plaintiff.   *See Norville*, 196 F.3d at 96.  Although that

employee had the same title as Plaintiff, she did not perform phlebotomies, the job that Plaintiff

claims was almost her exclusive task at Bellevue.  (Pl.'s Dep. 73)  Thus, Plaintiff has produced

no evidence that this employee was allowed to return to work even though she could not perform

her full duties, because Plaintiff has provided no evidence of what those duties were or how a

cast impaired them.[24]  Instead, Plaintiff seems merely to assume that the co-worker in a cast

---

[24]Even if Plaintiff had made out a prima facie case of discrimination based on her delay in
returning to work, her claim would still fail.  After a plaintiff makes a prima facie case, the
burden shifts to the Defendants to provide a legitimate, non-discriminatory reason for the
adverse employment action experienced by Plaintiff.  *See Patterson*, 375 F.3d at 221.  Here,
Defendants assert the hospital has a policy requiring employees be able to fully perform their
assigned duties prior to returning to work.  (Raboy-Braunstein Dep. 123-24)  Thus, Plaintiff
would then have to show, by admissible evidence, that this legitimate, non-discriminatory policy
is a pretext for discrimination.  *See Patterson*, 375 F.3d at 221.  Plaintiff has not done so.  First,
as noted above, there is no evidence that the application of the policy was inconsistent because
Plaintiff has provided insufficient proof that the employee in a cast was allowed to return to
work despite being unable to fully perform her duties.  *See Norville*, 196 F.3d at 96 ("In order for
employees to be similarly situated for the purposes of establishing a plaintiff's prima facie case,
they must have been subject to the same standards governing performance evaluation and
discipline, and must have engaged in conduct similar to the plaintiff's." (internal quotations
omitted)).  The only evidence that anyone has been accommodated and allowed to return to work
in spite of their inability to perform is Defendant Raboy-Braunstein's testimony that an

could not fully perform her duties.  This will not suffice.  *See Norville*, 196 F.3d at 96 (holding that plaintiff failed to establish a prima facie case where there was no evidence about the type of work done or the degree of impairment of other allegedly "similarly situated" employees).

Plaintiff has likewise failed to produce evidence that her disciplinary suspension for performing a venepuncture on a child whose parents had requested a different method of drawing blood was the result of discrimination.  Plaintiff has produced no evidence of any other disciplinary hearings involving other employees or any differential treatment for non-African-American employees accused of insubordination.  Although Plaintiff has alleged two of her supervisors made racist remarks, discussed *infra*, and that they manufactured the insubordination charges against her (Pl.'s Dep. 130), the suspension decision was made by a Labor Relations Officer (Defs.' Mot. Ex. S), not Plaintiff's allegedly racist supervisors, thus fatally undermining this claim.  *See Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 309 (S.D.N.Y. 2000) ("[I]t is fatal to plaintiffs' case that they only allege that [defendants], and not any of the decision-makers who were responsible for their termination harbored discriminatory feelings for them.").  Plaintiff did make a general allegation that unnamed non-African-American employees were not charged with misconduct when they performed a similar procedure on the same child whose parents complained about Plaintiff's treatment of their child.  (Pl.'s Dep. 192-95)  However, she

---

unspecified accommodation was given to Plaintiff.  (Raboy-Braunstein Dep. 123)  Second, Plaintiff herself has offered evidence that she was unable to perform the vast majority of her work duties.  Plaintiff's initial complaint about her assignment to the Pediatric Hematology laboratory was that her services were underutilized because her primary on the job duty was performing phlebotomies.  (Pl.'s Dep. 137-38)  Plaintiff's unproduced doctor's note stated she could return to work in October 2000 and perform all duties except for phlebotomies.  (*Id.* 72) She has never produced any evidence that she had any other duties.  Thus, Plaintiff was almost certainly unable to perform the vast majority of her duties in August 2000.  When Plaintiff was capable of performing phlebotomies, she returned to work.  (*Id.* 73)

produced no evidence, other than her own testimony, that any of these persons had performed

such a procedure or that they were not disciplined for that action.  Evidence of disparate

treatment cannot be based on conclusory allegations.  *See Finney v. Planned Parenthood of N.Y.*

*City, Inc.*, No. 02 Civ. 7942, 2003 WL 22928730, at * 4 (S.D.N.Y. Dec. 10, 2003) (granting

summary judgment where only evidence of disparate treatment was Plaintiff's own conclusory

allegations); *Griffin*, 103 F. Supp. 2d at 308 ("Statements that are devoid of any specifics, but

replete with conclusions, are insufficient to defeat a properly supported motion for summary

judgment." (internal quotations and citations omitted)).  In addition, Plaintiff has produced no

evidence, other than her own statement, that the Labor Relations Officer was somehow

controlled by Raboy-Braunstein and that her suspension decision was motivated by racial

animus.  Finally, Plaintiff faces another hurdle in trying to allege that her suspension, which

came after two separate hearings where she was represented by her union, was the result of

discrimination.  "Where [an adverse action] decision follows an evidentiary hearing and is based

on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must

present strong evidence that the decision was wrong as a matter of fact-e.g. new evidence not

before the tribunal-or that the impartiality of the proceeding was somehow compromised."

*Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002).  Plaintiff has produced no

evidence that would raise an inference that her suspension was the result of racial

discrimination.[25]

---

[25]Plaintiff claims that the motivation for her supervisors to manufacture these charges was
retaliation for her filing discrimination complaints against them.  (Pl's. Dep. 130)  That
allegation is discussed *infra*.

2.  Hostile Work Environment Claims

a.  Prima Facie Case of Hostile Work Environment

A plaintiff can state a cause of action under Title VII by demonstrating that his or her working environment is "overrun by racial antagonism."[26] *Lopez v. S. B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987).  To prove a hostile work environment claim, Plaintiff must produce evidence that "the workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment." *Patterson*, 375 F.3d at 227 (internal citations and quotations omitted).  Though a single incident may be severe enough to materially alter employment conditions, *see id.*, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002) (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)); *see also Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding episodic events insufficient).

The test for determining whether a workplace is a hostile work environment has both subjective and objective elements.  *See Alfano*, 294 F.3d at 374.  "[T]he misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  When determining whether an objectively hostile work environment exists, courts must consider the totality of the circumstances, including

---

[26]Plaintiff did not specifically plead a hostile work environment cause of action.  (*See* Am. Compl. ¶¶ 72-95)  However, she does claim that her discriminatory treatment created a "hostile and intolerable working environment."  (*Id.* 70)  The Court will construe this as a well-pled hostile work environment claim.

the frequency, severity and offensiveness of the allegedly discriminatory conduct, whether the conduct was physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *See Patterson*, 375 F.3d at 227. "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Id.*

The existence of a hostile environment alone is insufficient to make out a Title VII claim, however. Plaintiff must also show there is some reason to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to find an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with immediate or successively higher authority over a Plaintiff. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer [may be] subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment [sic] created by a mere co-worker of the victim." (internal quotations omitted) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998))). Finally, Plaintiff must prove that the hostile conduct occurred because of her membership in a protected class. *See Brennan*, 192 F.3d at 318 ("In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes."). To make such a showing, a plaintiff must

introduce evidence of hostile conduct that a reasonable juror could find was a result of the

plaintiff's membership in a protected class.  *See id.* at 318-19.

b.  Analysis

Under the standards above, Plaintiff has not established a hostile work environment

claim.  Plaintiff, at her deposition, gave a long list of allegedly harassing conduct, including:  (1)

other employees were not charged with misconduct after performing actions substantially similar

to those for which Plaintiff was suspended (Pl.'s Dep. 192); (2) that soon after she began

working at Bellevue two of her supervisors, Defendants Raboy-Braunstein and Dr. Hart, each,

on a single occasion, called her a "nigger" (Am. Compl. ¶ 20; Pl.'s Dep. 47-40, 169-71); (3) that

Defendant Raboy-Braunstein called her a "retard" (Am. Compl. ¶ 20) (4) a failure to investigate

claims that one of her supervisors called her a "moron" (Am. Compl. ¶ 38); (5) a delay in notice

about her suspension (Am. Compl. ¶ 56); (6) that she was refused a request for a holiday (Pl.'s

Dep. 198); and (7) all of the adverse employment actions discussed *supra*.

Initially, other than the alleged use of a racist epithet by her supervisor, Plaintiff has not

produced any evidence that any of this conduct was the result of racial discrimination.  For

example, she has produced no evidence that any similarly situated non-African-American

employees were treated differently, other than her own conclusory allegations.  Nor is there

evidence that some of the actions, for example the alleged "retarded" comment, were based on

Plaintiff's race or any other improper basis.  Thus, there is no need to repeat the analysis above

for the "almost innumerable" instances of alleged mistreatment that Plaintiff claims are evidence

of discrimination.  (Pl.'s Opp'n Mem. 21)  Though it is true that facially neutral comments may

contribute to the hostility of an employee's work environment, *see Raniola v. Bratton*, 243 F.3d

610, 621-22 (2d Cir. 2001) (holding that each individual instance of allegedly harassing conduct

29

need not be biased), there must be some basis to infer that the facially neutral comments are part of a workplace permeated with discrimination. When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile work environment claim. *See Kemp v. A & J Produce Corp.*, No. 00 Civ. 06050, slip op. at 35-36 (E.D.N.Y. Jan. 21, 2003, revised May 25, 2005), *aff'd* No. 03-7168, 164 Fed. Appx. 12 (2d Cir. Dec. 7, 2005).

The use of a racist epithet is certainly evidence of racial discrimination. "[P]erhaps no single act can more quickly 'alter the conditions of employment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinate." *Bailey v. Colgate-Palmolive Co.*, No. 99 Civ. 3228, 2003 WL 21108325, at *23 (S.D.N.Y. May 14, 2003) (quoting *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993)). However, even assuming Plaintiff's allegations about Defendants Hart and Raboy-Braunstein's use of racial epithets are true, the courts have found that infrequent comments, here a maximum of two comments over the one-and-a-half years that Plaintiff worked at Bellevue before filing this action, do not satisfy the objective proof requirement of a hostile work environment claim. *See Schwapp*, 118 F.3d at 110 ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal quotations and citations omitted)); *Stembridge v. City of New York*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (holding seven instances over three years does not constitute a work environment permeated with racial hostility); *Carter v. Cornell Univ.*, 976 F. Supp. 224, 232 (S.D.N.Y. 1997) (six comments over a number of years not hostile work environment). Plaintiff produced no other admissible evidence

30

of racial epithets other than her own deposition.  No other co-worker depositions were submitted.  Defendants Hart and Raboy-Braunstein, in their depositions, denied ever using such epithets.[27]  (Defs.' Mot. Ex. BB 83; Raboy-Braunstein Dep. 101)  The only additional evidence submitted is an unsworn letter allegedly signed by a co-worker saying she overheard Dr. Hart use a racial epithet.  This letter is unauthenticated and is hearsay, and should not be considered as evidence in opposition to a motion for summary judgment.  *See King v. Town of Wallkill*, 302 F. Supp. 2d 279, 299 (S.D.N.Y. 2004) (refusing to consider unsworn letter offered in opposition to motion for summary judgment); *see also Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("As a general matter, it is correct that unsworn letters from physicians generally are inadmissible hearsay that are an insufficient basis for opposing a motion for summary judgment."); *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657-58 (2d Cir. 1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.").  "While it is true that the stray marks of a decision-maker, without more, cannot prove a claim of employment discrimination, [the Second Circuit] has held that when 'other indicia of discrimination are properly presented . . . the jury has a right to conclude that [the remarks] bear a more ominous significance.'"  *Abdu-Brisson,* 239 F.3d at 468 (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).  Here, there are no other indicia of discrimination.  *Cf. Schwapp*, 118 F.3d at 112 (reversing summary judgment for employer based on ten "racially-hostile incidents" in a 20-month period, plus two other examples of bigotry toward other racial groups, plus another comment by a supervisor that the

---

[27]The Court also notes that Plaintiff never included any incidents regarding the use of racial epithets in any of her complaints to the EEOC.  (Defs.' Mot. Exs. R, T)

plaintiff had to accept racism in the workplace and not be so "sensitive"). Even in conjunction with other actions allegedly taken by these two individual defendants, Plaintiff has not brought forth sufficient admissible evidence to support a reasonable juror finding that a hostile work environment existed.

        3.  Retaliation

          a.  Prima Facie Case of Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must show that: (1) she was engaged in protected activity; (2) Defendants knew of this activity; (3) Defendants took an adverse action against Plaintiff; and (4) there is a causal connection between the adverse actions and the protected activity, i.e., that the Defendants had a retaliatory motive. *See Kessler v. Westchester County Dep't of Soc. Serv.*, 461 F.3d 199, 205-06 (2d Cir. 2006); *Hawana,* 230 F. Supp. 2d at 529. Proof of causation can be shown either: (1) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant; or (2) indirectly, by showing that the protected activity was followed closely by discriminatory treatment or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct. *See Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990); *Gilford v. City of New York*, No. 03 Civ. 0091, 2004 WL 1574695, at *7 (S.D.N.Y. July 14, 2004) (quoting *Gordon*, 232 F.3d at 117). "Title VII is violated if a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause, and if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the discharge." *See Sumner*, 899 F.2d at 209 (internal citations omitted). Plaintiff must make these showings by a preponderance of the evidence. *See Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1038 (2d Cir. 1993).

However, even if Plaintiff states a prima facie case, retaliation claims are still subject to *McDonnell Douglas* burden shifting. *See Sumner*, 899 F.2d at 209.

### b.  Analysis

Plaintiff engaged in multiple protected activities which satisfy the first element of a prima facie case of retaliation.  First, Plaintiff's previous discrimination lawsuit is a protected activity.  Second, the filing of her June 2000 EEOC complaint and her additional EEOC complaints filed from July to December 2001 also constitute protected activity.  Finally, the filing of the present action is a protected activity. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 210-11, 216 (2d Cir. 2001) (filing of discrimination claims is protected activity under Title VII). It is not necessary for claims to be successful to be protected, Plaintiff need only have a good faith, reasonable belief that discrimination occurred. *See Sumner*, 899 F.2d at 209.  That test is satisfied here.

Regarding the second element, Plaintiff has produced evidence that the relevant Defendants knew of her protected activity.  General knowledge of Plaintiff's protected activity is sufficient to make out a prima facie case. *See Kessler*, 461 F.3d at 210 ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." (citing *Gordon*, 232 F.3d at 116)).  Defendant Raboy-Braunstein, Plaintiff's supervisor, admits knowing that Plaintiff had previously filed a discrimination action, but claims she did not know when it was filed or when exactly she was made aware of it.  (Raboy-Braunstein Dep. 36)  Plaintiff alleges that she was questioned by Raboy-Braunstein and other non-defendant Bellevue Hospital employees about her settlement in her previous case against the Hospital and Health Corporation

upon her transfer to Bellevue Hospital.[28]  (Pl.'s Dep. 54)  Furthermore, Plaintiff filed numerous

EEOC complaints against Defendants Raboy-Braunstein and Persaud.  (Defs.' Mot. Exs. R, T)

Plaintiff also asserts that both Raboy-Braunstein and the hearing officer responsible for her ten-

day suspension were aware of her EEOC claims.  (Pl.'s Dep. 122-23)  Thus, construing all facts

in the light most favorable to Plaintiff, Plaintiff has met the minimal burden of showing general

knowledge of her protected activity.

        As for the third element, Plaintiff realleges that all of the alleged adverse employment

actions described above, including delaying her return to work after her injury, withholding a

replacement key, demanding documentation for requested vacation time, the "ambush"

urinalysis test, and her suspension, were in retaliation for her filing numerous EEOC complaints

and the present action.[29]  Although many of the events described by Plaintiff do not constitute

adverse employment actions for Plaintiff's intentional discrimination claim, they may still be

considered in the context of her retaliation claim.  *See Burlington Northern & Santa Fe Ry. Co.*

*v. White*, 548 U.S. — , 126 S. Ct. 2405, 2412-13 (2006) ("[T]he anti-retaliation provision, unlike

the substantive provision, is not limited to discriminatory actions that affect the terms and

_____

[28]Raboy-Braunstein denies this allegation.  (Raboy-Braunstein Dep. 34-37)

[29]All of the complained-of retaliatory acts took place in 2001 or early 2002.  The Complaint in
this action was filed in May 2002.  Events that took place prior to the filing of the Complaint
cannot be in retaliation for an event that had not occurred.  The only alleged adverse action taken
after the filing of this suit was a refusal to transfer Plaintiff to another hospital.  If Plaintiff had
been transferred, Defendants might have committed an adverse action.  *See Kessler*, 461 F.3d at
209 (transfer of employee after protected activity is adverse employment action).  Defendants
were caught in a catch-22, however, as refusal to transfer may also be an adverse employment
action where "an employee's work environment prior to the request is objectively unfavorable."
*Pimentel*, 2002 WL 977535, at *3.  As discussed *supra*, that was not the case here.  Thus,
Plaintiff has failed to produce any evidence that this action (or non-action) was in retaliation for
the filing of this lawsuit.

34

conditions of employment.").  This does not mean that all potential workplaces grievances are

fodder for retaliation claims, however.  *See id.* at 2415 ("We speak of *material* adversity because

we believe it is important to separate significant from trivial harms.  Title VII, we have said,

does not set forth a general civility code for the American workplace." (internal quotations

omitted)).  To constitute an adverse action for a retaliation claim, the allegedly retaliatory action

must be "materially adverse," in other words, it must be the type of action that would "dissuade[]

a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 2420

(internal quotations and citations omitted); *see also Kessler*, 461 F.3d at 207 (quoting *White*, 126

S. Ct. at 2415).  Plaintiff's suspension and delay in return to work, which meet the stricter Title

VII standard for adverse employment actions, meet this test.  Being asked to provide

documentation for vacation and experiencing a delay in replacing a lost key do not.  A

reasonable worker would not feel dissuaded from filing a discrimination claim after experiencing

the routine inconveniences that come with working at a large bureaucracy.  These instances are

much more akin to the "petty slights" and "minor annoyances" described by the Supreme Court

in *White* than an employment action which is "materially adverse."  *See White*, 126 S. Ct. at

2414-15.  It is informative that Plaintiff was in fact not dissuaded by these actions, as she

continued to file EEOC complaints after each incident.  (Defs.' Mot. Ex. T)

     Plaintiff has two additional allegations of retaliatory action that must be considered.

First, Plaintiff alleges her assignment to the Pediatric Hematology laboratory was in retaliation

for her previous discrimination complaint at Gouveneur Hospital.  The assignment to arduous

tasks, even without a change of job title, is one type of adverse action that could deter Title VII

protected activity.  *See White*, 126 S. Ct. at 2416 ("Common sense suggests that one good way to

discourage an employee such as [plaintiff] from bringing discrimination charges would be to

insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable."); *Kessler*, 461 F.3d at 209 (noting that Plaintiff was allowed to keep title after transfer, but lost supervisory authority and had to "undertake clerical tasks and to perform data entry alongside employees several grades below his").  Thus, even though this reassignment does not constitute an "adverse employment action," it might meet the lesser showing required for retaliation claims, at least enough for a jury to decide.  Second, Plaintiff alleges she experienced excessive scrutiny by her supervisors, including frequent testing that was not administered to other employees.  This also might meet the more lenient standard for Title VII retaliation claims for summary judgment purposes.  Just as a shift to less desirable tasks is a disincentive to employees' protected activity, so too can a supervisor use the "embarrassment and anxiety" that accompanies excessive monitoring to dissuade employees from engaging in protected activity.  *Castro*, 1998 WL 108004, at *7; *see also* 2 EEOC 1998 Manual § 8-II(D)(3) (using excessive scrutiny as an example of retaliatory action).  Thus, Plaintiff has shown four potential adverse actions that occurred after she engaged in protected activity.

The fourth and final element of a retaliation claim is proof of a causal connection between the adverse actions and Plaintiff's protected activity.  *See Kessler*, 461 F.3d at 206.  Here, however, Plaintiff struggles to prove any causal connection between the adverse actions and the retaliatory intent of the Defendants.  *See Gilford*, 2004 WL 1574695, at *7 (holding that plaintiff must show causal link between protected activity and retaliation).  This causal link may be shown directly or indirectly.  *See id.*  Plaintiff has no direct evidence of retaliatory motive for any of the allegedly retaliatory incidents.  Although Plaintiff states in her deposition that her suspension was retaliatory because the hearing officer's decision was made "through Carole

Raboy[-Braunstein]," she provides no direct evidence to support this claim other than her own conclusory testimony.  (Pl.'s Dep. 123)  Even if there was a link to Defendant Raboy-Braunstein, Plaintiff has produced no direct evidence that Defendant Raboy-Braunstein's actions were linked to her protected activity.  Instead, she relies primarily on indirect evidence, namely, the proximity between Plaintiff's protected activity and the alleged adverse actions brought against her.

A causal link between adverse action and retaliatory motive may be proven indirectly by showing that protected activity was closely followed with discriminatory action.  *See id.*  Such an indirect showing is often sufficient to survive summary judgment.  *See Sumner*, 899 F.2d at 209 ("Although no one piece of evidence is dispositive, the confluence of circumstances leaves us with a definite and firm conviction that a mistake was committed when the district court [granted summary judgment]." (internal quotations omitted))  Plaintiff's 1996 lawsuit was settled only weeks before her arrival at Bellevue, when she alleges the discriminatory actions against her commenced.  Most of Plaintiff's allegations of other instances of retaliation are sufficiently close in time to the complaints she made to the EEOC to support her prima facie case.[30]  Thus, Plaintiff has met her prima facie burden.  However, that does not end the inquiry.

---

[30]Plaintiff's assignment to the Pediatric Hematology laboratory occurred in May 2000, her first lawsuit was settled in April 2000.  Plaintiff was allegedly asked for documentation regarding her vacation in June 2000, and filed her EEOC complaint shortly thereafter.  The diagnostic test that Plaintiff claims was discriminatory was administered on June 12, 2000.  The delay in Plaintiff's post-injury return to work occurred in August 2000, and the alleged inadequate training, excessive scrutiny, and lost key incident occurred in December 2000 and January 2001.  The actions that formed the basis of Plaintiff's disciplinary suspension occurred in March 2001, and Plaintiff filed additional EEOC complaints between July 2001 and December 2001.  Some of these incidents, like the lost key incident and the training that occurred in January 2001, at least six seven months after Plaintiff's initial Bellevue EEOC complaint, test the limits of the Supreme Court's requirement that, for a Plaintiff to make out a prima facie case based on temporal proximity alone, the alleged retaliatory acts must be "very close."  *See Clark County*

It merely shifts the burden to the Defendants to present legitimate, non-discriminatory rationales

for their conduct.  *Hawana*, 230 F. Supp. 2d at 530.

Defendants have offered legitimate, non-discriminatory reasons for their conduct.

Primarily, they allege that the disciplinary actions taken against Plaintiff were the result of her

own insubordination and misconduct.[31]  (Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ.

J. 16-17 ("Defs.' Mem."))  For example, Defendants have produced numerous reports of

insubordination, filed by numerous persons, not just the named Defendants.  (Defs.' Mot. Exs. E,

J, L, M, N, O, P, Q)  Moreover, Plaintiff's suspension was the result of a hearing where she was

represented, and the suspension decision was made by an official with no interest in the

outcome.  The evidence overwhelmingly shows that Defendants' reasons for suspending Plaintiff

were non-discriminatory.

---

*Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554-555 & n.5 (2d Cir. 2001) (noting that there is no bright line rule when a retaliatory action becomes too attenuated to support a prima facie case of retaliation); *Bush v. Fordham Univ.*, Case No. 04 Civ. 01847, 2006 WL 2720616, at *16 (S.D.N.Y. Sept. 25, 2006) (noting that Plaintiff has a "weak argument" of temporal proximity when alleged retaliatory action occurred seven months after protected activity).  However, as Plaintiff's placement in the Pediatric Hematology laboratory occurred only one month after the settlement of her previous lawsuit, which meets the temporal proximity test, *see Bush*, 2006 WL 2720616, at *16, and the rest of Plaintiff's retaliation claims, as discussed *infra*, fail for other reasons, there is no need to draw a clear line of temporal proximity.

[31]In their papers, Defendants did not consider excessive monitoring, the delay in Plaintiff's return to work, and her assignment to the Pediatric Hematology laboratory as adverse employment actions, and thus did not specifically state non-discriminatory rationales for these actions in their brief.  These rationales are clear from the record, however.  As the Court has been more than generous in construing Plaintiff's papers to make the strongest arguments they suggest, it will not punish Defendants for failing to answer allegations that were not clear from the face of the Complaint or from Plaintiff's papers.  Thus, where the record clearly provides a non-discriminatory rationale for Defendants' conduct, the Court will consider whether the evidence from the record shows that Defendants have met their burden under *McDonnell Douglas*, and whether Plaintiff has shown that these reasons were merely a pretext for discrimination.

The same holds true for other adverse actions alleged by Plaintiff.  Plaintiff's delay in returning to work was the result of a policy that required her to be able to perform her duties before returning to work.  Plaintiff admits she was unable to perform her primary duty, phlebotomy, when she requested to return to work.  (Pl.'s Dep. 72)  When she was able to perform it, she was allowed to return.  The preponderance of the evidence supports Defendants, and no reasonable juror could find otherwise.  This is also true for Plaintiff's claims of excessive scrutiny.  Plaintiff's claims of excessive scrutiny are unsupported by any evidence other than her own allegations, which are conclusory,[32] and the fact that the alleged scrutiny was close in time to her filing of her complaints with the EEOC.  Defendants, to the extent that Plaintiff has shown evidence of any "excessive" scrutiny, produced evidence that most of the scrutiny alleged by Plaintiff came about as a result of poor performance.[33]  (Defs.' Mot.  Exs. D, E, P)  The purpose of her initial testing was diagnostic.  (Raboy-Braunstein Dep. 47-48, 58; Defs.' Mot. Ex. C)  Further testing is understandable, as she did not pass the initial test.  (Defs.' Mot. Exs. D, E, P)  Thus, while the testing did occur within two months of the settlement of her initial EEOC

---

[32]Although not relevant for her Title VII claim, it is important to note that Plaintiff's complaints of excessive scrutiny concern Dr. Hart, and the persons she alleged knew she had engaged in protected activity were Defendants Raboy-Braunstein and Persaud.  Although Title VII requires only general corporate knowledge of protected activity, this dissonance is relevant to any individual claims asserted by the Plaintiff under the New York State Human Rights Law.

[33]It is difficult to evaluate Plaintiff's claim regarding the timing of the retaliatory actions and her protected activity for two reasons.  First, Plaintiff makes only a general allegation of excessive scrutiny.  In her deposition, Plaintiff claimed that Dr. Hart "singled [her] out," and that he "stands over [her]" when she provides service to patients.  (Pl.'s Dep. 197)  Thus, it is impossible to determine when specifically the alleged scrutiny occurred.  Second, because Plaintiff was engaged in protected activity prior to her arrival at Bellevue, and filed an EEOC complaint within six weeks of her arrival, any activity of her supervisors is proximate to some protected activity.

complaint filed at Gouvenour (and within a few weeks of her start at Bellevue, a fact consistent with Defendants' claims), the preponderance of the evidence again supports Defendants.

In an attempt to rebut Defendants' "legitimate business reasons" for the actions allegedly taken, Plaintiff generally accuses the Defendants of lying and fabricating records.  (Pl.'s Opp'n Mem. 16 ("Who, more than defendants, would be motivated to create false reports of misconduct and insubordination? . . . If one were looking to terminate or force an employee to resign for discriminatory reasons, would it not make sense to create a record reflecting 'legitimate' reasons?"))  Such unsupported speculation does not satisfy Plaintiff's burden.  Plaintiff has the burden to produce evidence and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  *Hawana*, 230 F. Supp. 2d at 524.  "The critical question is whether a plaintiff has proven by a preponderance of the evidence that the defendant intentionally discriminated or retaliated against the plaintiff for engaging in protected activity."  *Cosgrove*, 9 F.3d at 1039.  Plaintiff has not done so.

Plaintiff has one remaining allegedly retaliatory action, her assignment to the Pediatric Hematology laboratory.  This is a closer question.  Plaintiff alleges that she was told prior to her assignment to Bellevue by the supervisor of Gouvenour hospital that Raboy-Braunstein had said Plaintiff would only perform phlebotomies when she came to Bellevue.  (Pl.'s Dep. 137)  The individual Defendants produced evidence that they had no knowledge of Plaintiff's protected activity prior to her assignment to the pediatric blood laboratory.  (Raboy-Braunstein Dep. 37)  The individual Defendants also produced evidence that they were not responsible for her placement in the Pediatric Hematology laboratory.  (Raboy-Braunstein Dep. 38-39)  Plaintiff's only evidence to rebut this sworn testimony is the timing of her placement, soon after the settlement of her initial discrimination case.  The institutional Defendants, who are the only

relevant Defendants for Plaintiff's Title VII claims, produced no explanation for why Plaintiff

was placed in the Pediatric Hematology laboratory.  Thus, the only evidence on the record

supports Plaintiff's claim of retaliatory action.  Thus, summary judgment on Plaintiff's claim

that her placement in the Pediatric Hematology laboratory was retaliatory must be denied.

As Plaintiff has failed to make a prima facie case for purposeful discrimination under

Title VII, and has failed to carry her burden of production under the *McDonnell Douglas* burden

shifting framework for her hostile environment, summary judgment in favor of Defendants with

regard to those Title VII claims is granted.  As Plaintiff has produced evidence, unrebutted by

Defendants, that her placement in the Pediatric Hematology laboratory may have been in

retaliation for her past protected activity, summary judgment as to Plaintiff's retaliation claim is

denied.

C.  New York State Human Rights Law[34]

Plaintiff does not specifically allege in her Amended Complaint that the Defendants

violated any state anti-discrimination law.  The six causes of action listed in the Amended

Complaint make no reference to any state law.  In her Memorandum of Law in Opposition to

Defendants' Motion for Summary Judgement, however, Plaintiff claims she alleged violations of

the New York State Human Rights Law ("SHRL").[35]   (Pl.'s Opp'n Mem. 3)   Plaintiff does not

_____

[34]Plaintiff asserted no claims, in her Amended Complaint or her Memorandum of Law, under the New York City Human Rights Law.

[35]Defendants appear to agree with this assertion.  In their own Memorandum of Law, Defendants claim that Plaintiff's Third Claim, at paragraph 84 of the Amended Complaint, asserts a state cause of action.  Paragraph 84 reads in full:  "By its action, defendants City of New York, Bellevue Hospital, and New York City Health and Hospital Corporation through their agents, servants, and/or employees intended to punish plaintiff for exercising her State and Federal right to report discriminatory practices in the work place."  Although this language is anything but conclusive, the Court construes Plaintiff's Complaint, as do Defendants, to assert SHRL claims

cite to any part of the Amended Complaint which contains an allegation of a state law violation

by Defendants, and Plaintiff has made no argument in her brief that differentiated her Title VII

claims from her state law claims.  Though a court may dismiss *sua sponte* a complaint that fails

to meet the liberal pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, it

may not do so when the opposing party promptly responds to the complaint.  *See Kittay v.*

*Kornstein*, 230 F.3d 531, 542 (2d Cir. 2000).  Here, both parties submitted papers regarding

violations of the SHRL.  Thus, this Court will liberally construe Plaintiff's pleading to include

state law causes of action.

The SHRL forbids employers from discriminating, and their employees from aiding and

abetting such discrimination, on the basis of race.  N.Y. Exec. L. §§ 296.1, 296.6.  When a

supervisor has "actually participat[ed] in the conduct giving rise to a discrimination claim," that

supervisor may be liable in his or her individual capacity under the SHRL.  *See Feingold v. New*

*York*, 366 F.3d 138, 157-58 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317

(2d Cir. 1995)).  When an individual is merely a co-worker, however, individual liability under

the SHRL applies only to those individuals who have aided and abetted the discrimination of

their employers.  *See id.*; *Picinich v. United Parcel Serv.*, 321 F. Supp. 2d 485, 520 (N.D.N.Y.

2004) ("Personal liability under [§ 296.6] is broader than that of, for example, § 296.1.").

SHRL claims are analytically identical to claims that arise under Title VII.  *See Torres v.*

*Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997) ("We have repeatedly noted that claims brought

under New York State's Human Rights Law are analytically identical to claims brought under

Title VII."). Thus, *McDonnell Douglas* burden shifting analysis applies to state law

---

for both discrimination *and* retaliation.  (Defs.' Mem. 4 )

discrimination claims under the SHRL just as it does to Title VII claims.  *See Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001); *Ferrante v. Am. Lung Assoc.*, 687 N.E.2d 1308, 1312 (N.Y. 1997).  Where, as here, parties in a Title VII action do not distinguish the applicable levels of proof for Title VII and SHRL claims, the Second Circuit has treated them as identical.  *See Mandell*, 316 F.3d at 377.  Therefore, as Plaintiff failed to establish an inference of discrimination for her discrimination and hostile work environment claims under Title VII, she is unable to establish any such inference with regard to her identical claims under the SHRL.  *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) (citing cases and granting summary judgment in favor of defendants on Title VII and SHRL claims).  Accordingly, summary judgment with regard to Plaintiff's state law discrimination and hostile work environment claims is granted.

Plaintiff's retaliation claim is more complicated.  Plaintiff has provided sufficient evidence to show that there is a material question of fact as to whether her placement in the Pediatric Hematology laboratory was discriminatory.  Plaintiff's state law claim against the hospital and municipal Defendants, therefore, also survives summary judgment.  As to any individual Defendants, however, Plaintiff's state law claims fail.  To make out a prima facie case of discrimination, Plaintiff must show that the individual Defendants "actually participate[d] in the conduct giving rise to [the] discrimination."  *Feingold*, 366 F.3d at 157-58.  Here, Plaintiff has produced no evidence that any individual Defendant participated in the decision to place her in the Pediatric Hematology laboratory.  She only states a general grievance with her placement there.  (Pl.'s Dep. 134, 138)  The only Defendant deposed about Plaintiff's placement denied any role in it, and Plaintiff has presented no admissible evidence to overcome that sworn denial.  (Raboy-Braunstein Dep. 38-39)  Thus, Plaintiff has failed to meet her prima facie burden against

any of the individual Defendants and summary judgment as to Plaintiff's state law claims against the individual Defendants must be granted.

D.  Section 1981

Plaintiff withdrew her § 1981 claims against the municipal Defendants, thus, her only remaining § 1981 claims are against the five individual Defendants.  (Pl.'s Opp'n Mem. 1 n.1) Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).  Section 1981 thus protects a plaintiff's right to enjoy "all of the benefits, privileges, terms and conditions" of his or her employment contracts.  42 U.S.C. § 1981(b). *McDonnell Douglas* burden shifting applies to employment discrimination claims under § 1981. *See Hudson v. IBM Corp.*, 620 F.2d 351, 354 (2d Cir. 1980).  An individual may be held liable under § 1981 where the plaintiff demonstrates "some affirmative link to causally connect the [defendant] with the discriminatory action."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal citations and quotations omitted).  Although the elements of a § 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of a § 1981 claim.  *See Patterson,* 375 F.3d at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 . . . must show that the discrimination was intentional.").  Thus, a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under § 1981.  *See Gonzalez*, 354 F. Supp. 2d at 330 n.2 ("Although claims under 42 U.S.C. § 1981 . . . involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination.  Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence

44

regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 . . . claims."
(internal quotations and citations omitted)); *Patterson*, 375 F.3d at 225 (holding that reasons
supporting summary judgment for defendants on Title VII claims also merited dismissal of
plaintiff's § 1981 claims). Here, as described in the previous section, Plaintiff has failed to show
intentionally discriminatory conduct on the part of any individually-named Defendant. As
Plaintiff withdrew any § 1981 claim against the municipal Defendants and has failed to state a
claim against the individually-named Defendants, summary judgment as to Plaintiff's § 1981
claims is granted.[36]

E. Defendants' Affirmative Defenses

Defendants assert a number of affirmative defenses. First, the municipal and hospital
Defendants argue that Plaintiff's failure to go to the Bellevue Equal Employment Opportunity
Office is an affirmative defense to Plaintiff's hostile work environment claim. As the Court
granted summary judgment in favor of Defendants on this claim, this issue is moot.

Second, All Defendants argue that Plaintiff's non-Title VII claims are collaterally
estopped because they were already litigated before the EEOC. Specifically, Defendant claims
that the EEOC finding of "no probable cause" precludes Plaintiff's § 1981 and SHRL claims.
Collateral estoppel prevents a party from relitigating issues actually adjudicated in a prior
litigation, when those issues were essential to the prior judgment. *See Clarke v. Frank*, 960 F.2d
1146, 1150 (2d Cir. 1992). Defendants argue that, as the Supreme Court has ruled that federal
courts must give preclusive effect to the holdings of an administrative agency acting in a judicial

---

[36]Plaintiff's papers do not discuss her emotional distress claim. However, because the Court
finds insufficient evidence to support her claims of racial discrimination, there is insufficient
evidence to support her emotional distress claim, as the cause of the distress was alleged racial
discrimination.

capacity, this Court must give preclusive effect to the EEOC's finding of "no probable cause."
*See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 797-99 (1986) (holding that agency must resolve
disputed issues of fact and that parties must have adequate opportunity to litigate); *DeCintio v.
Westchester County Med. Ctr.*, 821 F.2d 111, 117 (2d Cir. 1987) (holding collateral estoppel
applicable to quasi-judicial determinations of administrative agencies).  No court has ever held,
however, that EEOC proceedings are "sufficiently judicial in nature to warrant estoppel."[37]
*Richards v. Calvet*, 99 Civ. 12172, 2005 WL 743251, at *10 (S.D.N.Y. Mar. 31, 2005).  In fact,
the opposite is true, as every court that has considered the issue has found that EEOC
determinations have no preclusive effect.  *See McDonnell Douglas*, 411 U.S. at 798; *Richards*,
2005 WL 743251, at *10; *accord E.E.O.C. v. Jacksonville Shipyards, Inc.*, 696 F. Supp. 1438,
1441 (M.D. Fla. 1988).  This is also the position of the EEOC itself.  *See Richards*, 2005 WL
743251, at *11.  This is understandable, as the EEOC does not find or resolve issues of fact, the
hallmark of an administrative agency acting in a "judicial capacity."  *See Elliot*, 478 U.S. at 797-
98; *Georator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979) (describing EEOC probable
cause determinations as "lifeless" and being "merely preparatory to further proceedings").  The
EEOC's "no probable cause" finding is merely intended to notify potential defendants of the
EEOC's findings, not an adjudication of rights and liabilities.  *See Jacksonville Shipyards*, 696
F. Supp. at 1441.  In addition, the EEOC proceedings themselves are "not substantially similar to
those used in a court of law."  *Richards*, 2005 WL 743251, at *10.  For example, complainants

---

[37]It is noteworthy that the cases cited by Defendants, including *DeCintio*, hold that federal courts
must give administrative agencies acting in a judicial capacity "the preclusive effect which they
would be accorded" by a state court.  *See DeCintio*, 821 F.2d at 117.  Defendants cite no law,
and the Court is aware of none, that holds that New York courts give preclusive effect to "no
probable cause" determinations of the EEOC.

have no right to a formal hearing or to an appeal of an EEOC determination. *Id.* at *11. Additionally, the EEOC has no power to fashion remedies – instead, the hearing is simply "preparatory to further proceedings" which may occur in federal court. *Id.* Thus, Defendants' Motion for Summary Judgment cannot be granted on this basis.

Finally, all Defendants argue that Plaintiff's Title VII claims are time-barred because of her failure to timely file suit after the receipt of her right-to-sue letter from the EEOC. Once a litigant receives a right-to-sue letter, suit must be initiated within 90 days. 42 U.S.C. § 2000e-5 (f)(1); *see also Mendoza v. SSC & B Lintas*, No. 92 Civ. 709, 1995 WL 152545, at *7 (S.D.N.Y. Apr. 6, 1995). Failure to do so precludes the litigant from initiating an action arising from the same facts. *See Mendoza*, 1995 WL 152545, at *7.

Plaintiff did not bring suit within the 90-day period after her June 2000 right-to-sue letter. Thus, Plaintiff cannot bring suit for any claims based on facts that formed the basis of the first right-to-sue letter. To the extent that the second right-to-sue letter, dated December 2001, is based on the same facts as the first, Plaintiff cannot bring suit over those claims in this lawsuit. *See Lo v. Pan Am. World Airways*, 787 F.2d 827, 828 (2d Cir. 1986) (per curiam) (denying claims where second notice-of-claim was based on same facts as first notice-of-claim). However, existence of the June 2000 right-to-sue letter will not preclude the current suit "to the extent that plaintiff's Complaint is based on allegations in the second [EEOC complaint] which did not appear in the first [EEOC complaint]." *Dahbany-Miraglia v. Queensboro Comm. Coll.*, No. 03 Civ. 8052, 2004 WL 1192078, at *7 (S.D.N.Y. May 27, 2004). Thus, the alleged demand that Plaintiff produce documentation for her vacation, regardless of the fact that the Court found it non-actionable, cannot be considered in this action as it was the basis of her June 2000 complaint to the EEOC.

On or about December 31, 2001, the EEOC mailed Plaintiff a right-to-sue letter in response to her 2001 EEOC complaints.  (Defs.' Mot. Ex. U)[38]  Plaintiff's deposition testimony alleges that she never received the EEOC's December 31 letter.  (Pl.'s Dep. 226)  Plaintiff claims she contacted the EEOC and received a right-to-sue letter on Feburary 23, 2002.  (Defs.' Mot. Ex. U; Pl.'s Dep. 225)  Plaintiff commenced this action on May 17, 2002, 83 days later.

Typically, there is an assumption that a right-to-sue letter arrives three days after its mailing.  *See Sherlock v. Montefiore Medical Center*, 84 F.3d 522, 525 (2d Cir. 1996).  Additionally, it is typically presumed that a government agency has mailed a notice on the date shown on the notice.  *Id.* at 526.  However, this presumption is rebuttable, and only reasonable in the absence of evidence to the contrary.  *Id.*  Where there is admissible evidence or sworn testimony from which it may be reasonably inferred that the notice was mailed at a later date or did not arrive three days after the mailed date, the presumption is not dispositive.  *Id.*

Plaintiff's deposition testimony alleges she never received the EEOC's December 31 letter.  Further, the record contains a letter from Pedro Hernandez (Defs.' Mot. Ex. U), an EEOC investigator, showing that Mr. Hernandez was aware that Plaintiff claimed she had not received her right-to-sue letter.  Additionally, there is no other evidence which would suggest Plaintiff's claims regarding her right-to-sue letter are untrue.  *Compare Nash v. Human Develop. Servs. of*

---

[38]In this EEOC complaint, Plaintiff made general allegations of discrimination, which she supplemented with an additional letter.  Initially, Plaintiff simply made the general allegation that she was subject to race-based harassment and unjust disciplinary actions.  She supplemented this general allegation with a handwritten letter that described most of the allegedly discriminatory conduct that forms the basis of this action.  In this letter, she alleged that her urinalysis training was discriminatory, that her laboratory key had not been promptly replaced, that she was subjected to discriminatory testing, that she was not allowed to return to work even though healthy, and that her disciplinary suspension was a result of racial discrimination.  (Defs.' Mot. Ex. T)

*Westchester*, 02 Civ. 8551, 2003 WL 22871911, at *5 (S.D.N.Y. Dec. 4, 2003) (handwritten note

of date on right-to-sue letter envelope constituted admission of date which rebutted plaintiff's

unsworn allegations of a different date).  Thus, Plaintiff has produced sufficient evidence to

create a question of material fact as to whether the first letter was truly lost in the mail, and

therefore summary judgment on the basis of Plaintiff's alleged untimely filing of the Complaint

is denied.

       F.  Breach of Contract Claim

       In her Amended Complaint, Plaintiff alleged that Defendants' allegedly discriminatory

behavior breached its contract with Plaintiff.  (Am. Compl. ¶ 94)  Defendants argued, in their

Memorandum of Law, that Plaintiff was required, under New York state law, to grieve her

complaint with the union.  *See Berlyn v. Board of Ed. of E. Meadow Union Free Sch. Dist*., 435

N.Y.S.2d 793, 794 (N.Y. App. Div. 1981) (granting summary judgment where collective

bargaining agreement was exclusive means to grieve contractual disputes).  In her papers,

Plaintiff makes no argument regarding her breach of contract claim.  As there is no evidence

before the Court on this claim, from either party, Plaintiff has not shown the existence of any

question of material fact that would make summary judgment improper.  *See Goenaga*, 51 F.3d

at 18.  Therefore, summary judgment on this cause of action is granted.

       III.  Conclusion

       In conclusion, Defendants' Motion for Summary Judgment is DENIED IN PART and

GRANTED IN PART.  Summary judgment on all claims against the individual Defendants is

GRANTED.  Summary judgment on Plaintiff's intentional discrimination and hostile work

environment claims under Title VII and the SHRL, § 1981 claim, and contract law claim, is also

GRANTED.  Summary judgment on Plaintiff's retaliation claim under Title VII and the SHRL is

DENIED. The Clerk of Court is directed to enter judgment for Defendants Rayboy-Brauestein,

Persaud, Nelson, Refen, and Hart and to terminate Defendants' motion (Doc. No. 25).


SO ORDERED.

Dated:          November 9 , 2006
                New York, New York


                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

50

Service List:

Marshall Benjamin Bellovin
Ballon, Stoll, Bader & Nadler, P.C.
1450 Broadway 14th Floor
New York, NY 10018
Fax: (212) 764-5060

David Scott Levine
Jonathan Michael Bardavid
New York City Law Department
100 Church Street
New York, NY 10007
Fax: (212) 788-8877

Kevin R. Danztler
Michael A. Cordozo
Corporation Counsel of the City of N.Y.
100 Church Street Room 2-164
New York, NY 10007
Fax: (212) 788-0896